[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16604

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 22, 2010
JOHN LEY
CLERK

D. C. Docket No. 75-00666-CV-S-S

BIRMINGHAM FIRE FIGHTERS ASSOCIATION 117,
WILKS CLASS, et al.,

                                                    Plaintiffs-Appellees,

versus

CITY OF BIRMINGHAM, AL,

                                                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

Before BLACK, MARCUS and HIGGINBOTHAM,* Circuit Judges.

BLACK, Circuit Judge:

_____

* Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

Following decades of civil-rights litigation regarding discriminatory employment practices, the district court for the Northern District of Alabama assumed a direct supervisory role over the Personnel Board of Jefferson County in 2002. Incident to its supervisory function, the district court appointed two individuals to the three-member Board when vacancies arose in 2007. Shortly thereafter, the Alabama legislature passed Act 408, which entirely reconstituted the composition of the Board. In September 2008, the district court declared Act 408 void *ab initio* and affirmed that the court-appointed members would serve the remainder of their terms. The City of Birmingham now appeals this decision. This Court holds that it does not have jurisdiction to consider this matter because the appealed order, an interlocutory injunction, has since merged with a subsequent final order that neither party challenges. The City's appeal is therefore dismissed.

## I. BACKGROUND

In the 1970s, the United States, the NAACP, and a class of African-American municipal employees (the Martin Class) brought civil rights lawsuits against the City of Birmingham (the City), the Personnel Board of Jefferson

2

County (the Board), and several other state actors and municipalities.[1]  The

plaintiffs alleged that the defendants engaged in racially and sexually

discriminatory employment practices in violation of the Fourteenth Amendment,

Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981, among other

provisions.  In 1976, the first claims went to trial, and the district court ruled in

favor of the plaintiffs, finding that the Personnel Board's firefighter and police-

officer entrance examinations impermissibly discriminated against African-

Americans.

A second set of claims challenging additional entrance examinations and

other hiring practices went to trial shortly thereafter.  But, before the district court

reached a verdict, the parties entered into comprehensive consent decrees designed

---

[1] Over the decades, this Court has become quite familiar with the litigation involving the City of Birmingham and the Personnel Board of Jefferson County. As a result, this Court has had multiple opportunities to comprehensively set out the case's procedural and factual background, each time adding the latest chapter to the narrative. This opinion thus only briefly recounts the conflict's genesis; for a far more detailed explanation of the early years of this litigation, see *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1553–63 (11th Cir. 1994). The present opinion picks up the story in more detail where Judge Carnes left off in 1994, explaining how the controversy that started in the 1970s has continued into the second decade of the new millennium. As District Judge Smith observed in his September 2008 opinion, the case's thirty-year tenure in the federal-court system has solidified its Dickensian nature. *See United States v. Jefferson County, Ala.*, No. 2:75-cv-666 at 11 (N.D. Ala. Sept. 12, 2008) (mem. op. granting interlocutory injunction) (Smith, J.); *see also* CHARLES DICKENS, BLEAK HOUSE 4–5 (Pollard & Moss 1884) ("[The case] drones on. This . . . suit has, in course of time, become so complicated that no man alive knows what it means. . . . Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it. Scores of persons have deliriously found themselves made parties . . . without knowing how or why . . . . [It] still drags its dreary length before the court . . . .").

to develop and implement constitutional, nondiscriminatory employment practices. These initial decrees, finalized in 1981, included several gender- and race-conscious provisions, including hiring and promotional quotas. The implementation of these 1981 Consent Decrees in turn prompted civil-rights lawsuits throughout the 1980s. In this resulting litigation, several non-black male litigants collaterally challenged the constitutionality of the new gender- and race-based quotas, alleging the decrees amounted to reverse discrimination.

In 1990, a class representing these non-black male employees (the Wilks Class) intervened in the present litigation and, along with the United States, moved the court to modify the 1981 Consent Decrees to address the allegedly unconstitutional employment quotas. As a result, in 1991, the district court ordered the City to cease relying on annual quotas as soon as it either reached its long-term diversity goals or developed nondiscriminatory screening procedures. Similarly, the court ordered the Board to cease using quotas when it developed nondiscriminatory employment examinations. Until those goals were achieved, however, both the City and the Board were to continue to rely on employment and promotional practices that granted preferential treatment to African-Americans and women. The Wilks Class and the United States then appealed this district-court order to the Eleventh Circuit.

4

In 1994, this Court held that the district court's 1991 modification of the 1981 Consent Decrees could not withstand constitutional strict-scrutiny analysis, given the decrees' use of explicit racial and gender quotas to achieve impermissibly inflexible long-term goals. Accordingly, this Court reversed the 1991 order in relevant part and mandated that the district court substantially revise the 1981 Consent Decrees. This Court, however, did not merely remand the case for further proceedings; rather, it took the opportunity to reprimand the Board for a consistent failure to take seriously the task of developing constitutionally permissible policies. To that end, this Court bemoaned the "casual pace the Board has passed off as progress for thirteen years," and emphasized that the consent decrees were not "a security blanket to be clung to, but a badge of shame, a monument to the Board's past and present failure to treat all candidates in a fair and non-discriminatory manner." *Ensley Branch*, 31 F.3d at 1577–78. In the hopes that this sharp language would provide the spark the Board had lacked throughout the previous decade, this Court instructed the district court to "set prompt deadlines for the City and the Board to develop and implement valid job-selection procedures," and commanded the parties to comply "forthwith." *Id.* at 1575, 1577.

5

On remand, the district court ordered the City and the Board to develop and institute employment selection procedures that either "have no adverse impact on the basis of race or sex" or are "job related . . . and consistent with business necessity, in accordance with Title VII." Despite this Court's clear mandate and the district court's renewed directives, the Board nevertheless failed to take any serious steps toward compliance throughout the remainder of the 1990s. As a result, the Wilks Class filed a motion for civil contempt against the Board in 1998.

The turn of the millennium brought a vigorous but ultimately unsuccessful effort by Judge C. Lynwood Smith, Jr., to resolve the then quarter-century-old litigation. After nearly two years of this renewed push, Judge Smith determined that the Board remained resolutely uninterested in cooperating; consequently, in 2002, he granted the Wilks and the Martin/Bryant[2] Classes' joint motion for civil contempt. In its opinion, the district court explained that "the Board members failed to apprehend their legal obligations, or take any steps—much less meaningful steps—to ensure compliance."[3] As a result of the Board members'

_____

[2] When the district court certified the Wilks Class of non-black, male employees in 1990, it also certified a class representing all African-American and all female employees. This new class, the Bryant Class, subsumed the previous Martin Class of black employees and, as a result, has become known as the Martin/Bryant Class.

[3] During the contempt proceedings, the Board chairman, James Johnson, testified that he was not familiar with either the original 1981 Consent Decree or the district court's 1995 modification order. He also testified that he neither had read this Court's 1994 *Ensley Branch*

6

delinquency, the district court placed the Personnel Board in receivership, thereby vesting the Board's power almost entirely in a court-appointed Receiver.

In the years that followed, the Receiver made significant progress toward achieving this Court's 1994 *Ensley Branch* mandate. As a result of this success, the district court determined that it could gradually reduce its supervisory role by incrementally shifting the receiver's power back to a three-member board. This transition was governed by the 2004 Transition Plan, which permitted the Board to regain many of its functions and directed that the district court would ultimately extricate itself from the Board's operations. Until the transition was complete, however, the court retained a significant oversight role, which included the ability to appoint board members if necessary.[3]

When two Board-member positions, including the chairmanship, became vacant in 2007, the district court exercised its appointment power to fill the

---

decision, nor had he met with the other board members to discuss its significance. A second board member, Temple Tutwiler, likewise acknowledged that he was ignorant of the 1981 Consent Decree, the *Ensley Branch* decision, and the 1995 modification order. The third board member, Robin Burrell, a practicing attorney, testified that she had read *Ensley Branch* more than once, but, when asked "[d]o you recall what that opinion said," she responded, simply, "No."

[3] Under the Board's enablement statute, the Citizens Supervisory Commission (CSC), a committee of various community leaders, is tasked with appointing and confirming Board members. *See* Enabling Act of the Personnel Board of Jefferson County, 1945 Ala. Acts 248 (as amended). The 2004 Transition Plan, however, reserved this appointment power to the district court if the CSC was unable or unwilling to appoint qualified Board members in a timely manner.

vacancies. In the spring, the court appointed Alfred F. Smith, Jr., as chairman; in the summer, it appointed Ann D. Florie as a Board member. Shortly thereafter, and perhaps in response to the district court's appointments, the Alabama legislature passed Act 408, a statute that entirely reconstituted the composition of the Board. The Act increased the number of Board members from three to seven, and specifically required that two of the seven seats be filled by African-Americans.[4] The Alabama governor signed the Act into law in May 2008.

Following the law's enactment, the district court ordered that the three-member Board remain in place for thirty days to avoid the outright confusion that

---

[4] The bill reads:

*Membership of the personnel board.* The personnel board shall be comprised of seven members consisting of the following persons: The Chair of the County Commission of Jefferson County; the mayor of the municipality having the greatest number of employees in the classified service; one member of the Jefferson County Mayors Association; an Alabama nonprofit corporation, not otherwise serving hereunder who is appointed by its governing body; two employees in the classified service, one of whom shall be African American not otherwise serving hereunder who shall be elected by popular vote of the permanent employees in the classified service from a list of nominations submitted to the director under the signatures of at least five employees in the classified service on or before September 30 of each year; and two persons appointed by the presiding Judge of Probate of Jefferson County, one of whom must reside in the Bessemer judicial division and one of whom must reside in the Birmingham judicial division, one of whom shall be African American and each of whom shall be qualified electors in the county, and neither of whom, nor any spouse or lineal descendant of a grandparent of such person or his or her spouse, shall be a current or former employee in the classified service or have held any public office of an appointing authority at any time.

2008 Ala. Acts 408 (emphasis added).

8

would have resulted had Act 408 taken immediate effect. The following week, the Wilks Class, later joined by the Board itself, filed a motion challenging the constitutionality of the Act, arguing that the race-based provisions violated the Equal Protection Clause, and that the Act as a whole violated the Supremacy Clause. As a result, on June 3, 2008, the district court directed the three-member Board to continue to serve until the constitutionality of the Act could be fully adjudicated, explaining that "it makes little sense for Act No. 2008-408 to be implemented while its constitutionality is in question." The Martin/Bryant Class and the City then responded to the Wilks Class and Board's motions, and the district court considered the parties' contentions over the following months.

By the end of the summer, the district court had reached a decision and was ready to rule on the constitutionality of Act 408. In September 2008, the district court entered an order (the September Order) declaring the Act "void *ab initio* as violative of the Supremacy Clause of the United States Constitution." The court then directed that the "three current members of the board governing the functions of the Personnel Board of Jefferson County shall continue to serve until their respective terms expire, or until they are otherwise relieved of their duties by further order of this court." The City of Birmingham appealed from this September

9

Order, arguing that Act 408 did not violate the Supremacy Clause, but rather advanced the purpose of the previous federal-court orders.

Two months later, while the City's appeal was pending before this Court, the district court entered a final order (the November Order) that, after more than three decades of conflict and litigation, finally terminated the Personnel Board's consent decree. The district court explained that the Board had "complied with its Consent Decree in good faith," had "demonstrated a good faith commitment to continued compliance with federal law," and had "implemented policies, practices, and procedures which make it unlikely that the Board will repeat its former violations . . ., making it unnecessary for this Court to provide further judicial supervision." Although the district court terminated its supervisory function, the court nevertheless directed that the two Board members appointed in 2007 and reaffirmed by the September Order, "shall serve the remainders of their unexpired terms." The district court then certified this judgment as a final order pursuant to Federal Rule of Civil Procedure 54(b), and no party appealed.

## II.  DISCUSSION

Before considering the merits of the City's arguments, this Court must first establish whether it has jurisdiction to hear this appeal.  Like all jurisdictional

questions, the issue is reviewed de novo. *See United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009).

In its September Order, the district court determined that Act 408 was void *ab initio* and that it therefore did not affect the appointments of Mr. Smith and Ms. Florie to the Board. The court then ordered that those two board members would serve the remainder of their six-year terms. The September Order thus meets the classic definition of an injunction: it was "a clear and understandable directive from the district court, . . . enforceable through contempt proceedings, and it . . . [gave] some or all of the substantive relief sought in the complaint." *See Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1358 (11th Cir. 2008). As a result, the district court's order constituted an interlocutory injunction regarding the Board members' appointments: it was a non-final order mandating that Mr. Smith and Ms. Florie would continue their terms of service.

Ordinarily, only final judgments of a district court are appealable to the United States Courts of Appeals, whereas interlocutory orders are not. *See* 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."). But, § 1292 provides an exception to § 1291's final-judgment rule: § 1292 permits the federal circuit courts to hear appeals from "[i]nterlocutory orders of the district courts of

11

the United States, . . . granting, continuing, modifying, refusing or dissolving injunctions . . . ." § 1292(a)(1). Thus, because the September Order provided injunctive relief—that is, it mandated that the Board members continue to serve their respective terms—§ 1292 initially granted this Court jurisdiction over the City's appeal, despite the fact that the September Order was not a final judgment.

Intervening events can affect an appellate court's jurisdiction over an interlocutory appeal, however. In November 2008, the district court issued a subsequent order declaring that the Board had satisfied the requirements of its consent decree and had adequately demonstrated its commitment to maintaining constitutional employment procedures. That judgment also reaffirmed the September Order's directive—that is, the district court again declared that Mr. Smith and Ms. Florie were to serve the remainder of their respective terms as Board members. This November Order, containing the very same injunctive relief as did the September Order, constituted a final judgment, as evidenced by the district court's certifying it as such under Federal Rule of Civil Procedure 54(b).

Thus, with the entry of the November Order, the district court finalized the September injunction; it is this crucial change in circumstances that ultimately prevents this Court from hearing an appeal from that initial September Order. In essence, the November Order stripped this Court of its jurisdiction over the City's

appeal because, when a final injunction incorporates the same relief as an interlocutory injunction, an appeal is properly taken only from the final order. *See Burton v. Georgia*, 953 F.2d 1266, 1272 n.9 (11th Cir. 1992) ("Once a final judgment is rendered, the appeal is properly taken from the final judgment, not the preliminary injunction."); *SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 433 (5th Cir. Unit A May 1981) ("Once an order of permanent injunction is entered . . ., the order of preliminary injunction is merged with it, and appeal is proper only from the order of permanent injunction.").[5]

As a result of the September Order's merger with the final November Order, this Court no longer has jurisdiction to hear the City's appeal.[6]

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[6] This Court notes that even if the September Order were interpreted as an interlocutory declaratory judgment regarding the constitutionality of Act 408, rather than as an interlocutory injunction regarding the appointed Board members, this Court would still lack jurisdiction to hear the City's appeal. Title 28 U.S.C. § 1292 applies only to interlocutory injunctions; it makes no exception to § 1291's final judgment rule when the concerned interlocutory order is declaratory in nature. This Court also notes that the City has made no attempt to invoke appellate jurisdiction under § 1291.

## III. CONCLUSION

The City appeals an interlocutory injunction that has since merged with a final order. Because a challenge is proper only from that final order, this appeal is dismissed for lack of jurisdiction.

**DISMISSED.**